In re AMERICAN LUMBER COMPANY, a Minnesota Corporation, Bankrupt.

Edward W. BERGQUIST, Trustee of the Bankrupt Estate of American Lumber Company, Plaintiff,

v.

FIRST NATIONAL BANK OF ST. PAUL, Defendant.

Bankruptcy No. 4–76 BKY 188(O)(C–1).

United States Bankruptcy Court, D. Minnesota, Fourth Division.

July 11, 1979.

Stuurmans & Kelly, P. A. by Jan Stuurmans, Minneapolis, Minn., for plaintiff–trustee.

Maun, Hazel, Green, Hayes, Simon & Aretz by Richard D. Donohoo, St. Paul, Minn., for defendant The First National Bank of St. Paul.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

KENNETH G. OWENS, Bankruptcy Judge.

The above captioned matter came on for trial before the undersigned judge of Bankruptcy Court on October 30, 1978, at the United States Courthouse at Minneapolis, Minnesota. The trial proceeded until No-

vember 3, 1978, was recommenced December 11, 1978, and concluded on December 12, 1978.

Stuurmans & Kelly, P. A. by Jan Stuurmans, Esq., Minneapolis, Minnesota, appeared for the plaintiff–trustee; Maun, Hazel, Green, Hayes, Simon and Aretz by Richard D. Donohoo, Esq., St. Paul, Minnesota, appeared for defendant The First National Bank of St. Paul.

Based on the testimony and evidence and having considered the briefs submitted by counsel, and being fully advised in the premises, the Court makes findings of fact, conclusions of law, and order for judgment, as follows:

## FINDINGS OF FACT

1. The bankrupt, American Lumber Company (hereafter "ALC") was first incorporated under the laws of Minnesota as Medical Engineering Corporation, but its name was changed to U. S. Lumber, Inc. and changed again on January 17, 1975 to American Lumber Company. During all its relevant operating life its principal place of business has been at Minneapolis, Minnesota.

2. Another Minnesota corporation named American Lumber Company was in existence prior to January 17, 1975 as a wholly owned subsidiary of Shelter Corporation of America and engaged in the wholesale lumber business. The continuance in business of that corporation was uncertain in 1974 and three of its officers and employees, Paul A. Lilja, Ludwik J. Kulas, and Timothy L. Peterson, explored the possibility of purchasing its operating assets.

3. A letter of intent dated November 4, 1974 (Plaintiff's Exhibit 1) on the letterhead of Shelter Corporation of America expressed the intention of the old American Lumber Company to sell its mentioned employees its operating assets, including real estate, equipment, inventory, and accounts receivable. The sale of assets was consummated on January 17, 1975, when the following documents were executed by the parties:

a. U. S. Lumber, Inc. Promissory Note dated January 17, 1975, in the sum of $1,000,000.00 payable to defendant–bank. (Plaintiff's Exhibit 7);

b. U. S. Lumber, Inc. Security Agreement granting a security interest in accounts receivable and contract rights to defendant–bank and related financing statement. (Plaintiff's Exhibits 8 and 9 and Defendant's Exhibits 49 and 50);

c. U. S. Lumber, Inc. Promissory Note for $500,000.00 payable to defendant (Plaintiff's Exhibit 6);

d. U. S. Lumber, Inc. Mortgage of real estate in favor of defendant (Defendant's Exhibit 56);

e. Agreement between the old American Lumber Company and U. S. Lumber, Inc. dated January 17, 1975 (Plaintiff's Exhibit 2);

f. Loan Agreement between U. S. Lumber, Inc. and defendant (Plaintiff's Exhibit 3);

g. U. S. Lumber, Inc. Employees Stock Ownership Plan and Trust Agreement (hereinafter "ESOT") (Plaintiff's Exhibits 13 and 14);

h. Loan Agreement between U. S. Lumber, Inc. Employees Stock Ownership Trust (hereafter ESOT) and defendant (Plaintiff's Exhibit 10);

i. ESOT Promissory Note dated January 17, 1975 for $1,000,000.00 payable to defendant (Plaintiff's Exhibit 5);

j. Pledge by ESOT of its common stock interest in U. S. Lumber, Inc. to defendant to secure its promissory note (Plaintiff's Exhibit 17);

k. Stock Certificate representing ESOT ownership of 10,000 shares of common stock of U. S. Lumber, Inc. (Plaintiff's Exhibit 16);

l. U. S. Lumber, Inc. Guaranty of the $1,000,000.00 ESOT indebtedness to defendant (Plaintiff's Exhibit 10).

4. In substance, defendant–bank, which had been the primary operating lender for the old American Lumber Company, fi-

nanced the acquisition of the operating assets of the old American Lumber Company by U. S. Lumber, Inc. (the predecessor to ALC) by loaning $1,500,000.00 to U. S. Lumber, Inc. directly and another $1,000,000.00 indirectly in the form of a loan to ESOT, the proceeds of which were used to purchase 92.6% of the common stock of U. S. Lumber, Inc. by ESOT. (Plaintiff's Exhibits 11 and 12). The proceeds of all loans were used to purchase the operating assets of the old ALC and ultimately to reduce its indebtedness to defendant. (Ibid.).

5. Each promissory note described above contained a schedule for payment of principal and interest. (Plaintiff's Exhibits 5, 6, and 7). The Letter Loan Agreement between U. S. Lumber, Inc. and The First National Bank of St. Paul contained numerous covenants and conditions including provisions defining defaults thereunder. (Plaintiff's Exhibit 3).

6. At all material times, Paul Lilja was President and a director, Ludwik Kulas was Treasurer, Secretary and a director, and Timothy Peterson was Vice President and a director of ALC. They respectively owned 3%, 2.2% and 2.2% of the common stock of ALC. (Plaintiff's Exhibit 11). These individually owned shares were purchased by an aggregate $80,000.00 in personal loans extended by the defendant to the three individuals. Their ALC stock was pledged to defendant to secure the personal loans.

7. After January 17, 1975, ALC commenced operation of a wholesale lumber business. It purchased lumber, held it in inventory and sold it to residential and commercial builders. The building and lumber business climate in the summer and fall of 1975 was unfavorable (Plaintiff's Exhibit 11) and ALC suffered losses in the following amounts:

| | | |
|---|---|---|
| May | 1975 | $27,144.00 |
| June | 1975 | $31,480.00 |
| July | 1975 | $102,360.00 |
| August | 1975 | $42,380.00 |

8. Although a September 30, 1975, profit and loss statement was prepared in a form similar to those for other months, it could not be located and produced at trial. Other evidence however shows a loss of approximately $132,000.00 was sustained in September, 1975.

9. On September 19, 1975, defendant loaned ALC $100,000.00, evidenced by demand promissory note (Plaintiff's Exhibit 18). The loan was made because ALC was short of cash (Plaintiff's Exhibit 11).

10. ESOT made timely April 15 and July 15, 1975 installment payments on its $1,000,000.00 loan from defendant. The April 15, 1975, installment was paid by ALC Check No. 0323 payable to defendant in the sum of $45,916.67. (Plaintiff's Exhibit 60). The July 15, 1975, installment was paid by ALC Check No. 0874 payable to defendant in the sum of $45,947.92. (Plaintiff's Exhibit 61). On October 15, 1975, the principal balance was $937,500.00; the third installment in the sum of $31,250.00 together with accrued interest at 6%, was due and was not paid by either ESOT or ALC.

11. On October 17, 1975, the three principals of ALC met with Richard L. Shepley and Dennis K. Dingman, officers of defendant, and advised them that the loan was in default and ALC was acutely short of cash, and proposed a "cut–back" plan designed to improve the financial stability of ALC. The August 31, 1975, ALC financial statements (Plaintiff's Exhibit 24) were delivered to defendant.

12. On October 20, 1975, defendant ceased paying overdrafts on ALC's checking accounts (payroll and general). (Plaintiff's Exhibit 11).

13. On October 21, 1975, a meeting was held at the office of defendant–bank. It was attended by bank officers Shepley and Dingman, two of its counsel, Jerome Simon, Esq. and Charles Bans, Esq., ALC officers Lilja, Kulas and Peterson, and ALC counsel Leo Stern. Shepley announced at the outset that defendant was calling all of the indebtedness of ALC. There was discussion concerning foreclosure of defendant's security interests in the assets of ALC. Simon learned that defendant had no security interest in the inventory of ALC, a discussion ensued between defendant's officers and its

counsel, and Simon remarked in substance that he had an idea whereby a security interest could be taken on the inventory of ALC, funds could be advanced by defendant to ALC to increase the value of certain accounts receivable on projects that were not completed and in which defendant had security interest, and the general creditors could be "screwed". No accommodation was reached during this meeting. Approximately $400,000.00 of unsecured creditors other than defendant existed at that time. Defendant considered placing ALC in bankruptcy. (Plaintiff's Exhibit 30).

14. On October 22, 1975, another meeting was held attended by Lilja, Kulas and Peterson of ALC and Shepley and Dingman of defendant. Discussion centered around the value of the interest of ALC in a housing project known as Lame Deer, Montana, in which ALC had made a substantial investment which would be seriously jeopardized if it were not completed. Again, no resolution of the situation occurred. Plaintiff's officers refused to execute security agreements covering the inventory and equipment of ALC.

15. On October 23, 1975, Shepley and Dingman of defendant advised Lilja of plaintiff that no further funds would be advanced to ALC, that defendant was declaring ALC in default on its promissory notes and the demand promissory note of September 19, 1975, and that defendant was offsetting all funds in the accounts of ALC with defendant. (Plaintiff's Exhibit 11). Such offsets were then made. (Ibid.).

16. On October 24, 1975, Dingman hand delivered a letter from Shepley to Lilja of ALC (Plaintiff's Exhibit 32). The letter recited all the existing defaults, including the failure to pay the ESOT installment due on October 15, 1975 and detailed what the bank had done and proposed to do. Security Agreements describing inventory and equipment of ALC and corresponding financing statements were executed and delivered to defendant. (Plaintiff's Exhibits 33, 34, and 35).

17. On October 24, 1975, the liquidation of the business of ALC under the supervision of defendant began.

18. All cash and amounts collected on accounts receivable were given by ALC to defendant, which deposited them into a "collateral" or "dominion" account which was opened at Mr. Dingman's instruction and on which he was the sole signatory. (Plaintiff's Exhibits 88 and 89). On October 24, 1975, defendant foreclosed upon its security interests in accounts receivable and contract rights and at no time thereafter relinquished its control over the collection of accounts receivable.

19. On October 24, 1975, ALC's obligation on its Guaranty of the $1,000,000.00 loan obligation of ESOT to defendant was unconditional. (Plaintiff's Exhibit 10). The only assets of ESOT on that date were 10,000 shares of common stock of ALC which had been pledged to defendant and $93.47 in its general checking account. (Plaintiff's Exhibit 88). The common stock of ALC had no value.

20. On October 24, 1975, the fair market value of the assets of ALC were approximately as follows:

| | |
|---|---|
| Cash | [ − ] |
| A/R (1,477 − 300 [shelter] − 25 + 90 cc) | 1,262 |
| Inventories | 771 |
| Prepaid | 20 |
| Fixed Assets | 512 |
| | 2,565 |

(Plaintiff's Exhibit 95).

21. On October 24, 1975, the liabilities of ALC were as follows:

| | |
|---|---|
| Accounts Payable | 570 |
| Accrued Liabilities | 50 |
| Salaries | 20 |
| Long Term Debt | 1,587 |
| Mortgage | 167 |
| Indebtedness on Guaranty of ESOT | 937.5 |
| | 3,331.5 |

(See Plaintiff's Exhibit 95).

22. On October 24, 1975, the liabilities of ALC substantially exceeded the fair and reasonable value of its assets, by $766,500.00 more or less, and ALC was insolvent.

23. Prior to October 24, 1975, ALC had employed Park Detective Agency, Inc., a

security guard service, to guard its lumber yard in Minneapolis. On October 24, 1975, defendant contacted Mr. Pavey, President of Park Detective Agency, Inc., and informed him that defendant wished to contract with his firm to secure the premises of ALC. A contract was entered into between Park Detective Agency and defendant on October 25, 1975. Thereafter, defendant instructed Park as to whom could be admitted to the premises and in effect took control over access to said premises. (Plaintiff's Exhibit 84). Defendant instructed Park that Messrs. Shepley, Dingman and Woeltge were to be contacted in emergency situations and gave Park their home telephone numbers. (Plaintiff's Exhibit 84). Defendant advised Park it would pay all fees of Park. It paid fees for those services rendered from October 25, 1975, to March 1, 1976, at which time it discharged Park. (Plaintiff's Exhibits 84, 85, and 86). Park during this time period received instructions either by telephone or notes from defendant when admitting individuals to the ALC lumber yard.

24. On October 24, 1975, all employees of ALC were terminated. On or about October 31, 1978, effective October 28, 1978, ALC rehired a skeleton crew for the yard and truck driver employees, an accounts receivable clerk, an accounts payable clerk, two city desk clerks, and a receptionist. Its entire sales force of approximately four employees was not rehired because further sales were not contemplated. Before rehiring those employees identified above, in accordance with instructions from defendant, ALC advised Dingman who in its view were necessary to conduct an orderly liquidation and defendant approved of their rehiring and agreed to honor payroll checks for them. (Plaintiff's Exhibit 32). This conduct was only consistent with orderly liquidation of ALC.

25. On or about October 24, 1975, defendant, by and through Dingman, began receiving and opening the in-coming mail at the office of ALC and at all material times thereafter continued doing so on nearly a daily basis. All checks and cash so received were taken by Dingman and deposited into the collateral (dominion) account described in paragraph 18. This conduct was consistent with orderly liquidation of ALC.

26. On and after October 24, 1975, defendant, by and through Dingman, reviewed ALC checks prepared by ALC which had not been delivered to payees and ALC checks presented for payment by payees, and determined whether they respectively would be released or paid. Defendant made such determinations based upon its understanding and belief as to whether or not such payment would likely enhance the value of one or more of the accounts receivables in which defendant had a perfected security interest. When defendant believed there would be such an increase, the check was released or paid; when it believed the contrary, the release or payment was not authorized. General unsecured creditors were not paid unless that test was satisfied. On and after October 24, 1975, defendant did not intend to pay general unsecured creditors. Sales taxes incurred were not approved for payment by defendant. This conduct was only consistent with orderly liquidation of ALC.

27. During the course of meetings between October 17, 1975, and October 24, 1975, much discussion between representatives of ALC and defendant centered on a project known as Lame Deer, Montana, which was a government–financed housing development for Indians on and around the Cheyenne Indian Reservation. Defendant was advised that ALC had been awarded a subcontract by G. R. Construction Co. dated July 1975 (Defendant's Exhibit 99), which had a contract price of $1,026,365.00 payable to ALC if entirely completed. The terms of payment were stated in the Subcontract. Under the subcontract ALC had the duty to furnish construction supplies and materials, fabricate them into panels, furnish all of the labor related to fabrication and construction, and construct residences. Payment to be made as residences were completed and accepted. Prior to October 24, 1975, only one payment had been made to ALC by G. R. Construction Co.

That payment was in an approximate sum of $34,000.00 and ALC anticipated receiving more funds as the project continued. Virtually all materials and supplies required for completion of the project had been delivered to the Lame Deer project site prior to October 24, 1975, however, some additional materials and substantial amounts of labor were necessary. ALC had contracted with Aetna Oak–Mak Construction Co. to furnish all labor on the project. Defendant was advised about the status of the subcontract and decided that the potential high value of the G. R. Construction account receivable of ALC would be in serious jeopardy if the project were not completed and that such jeopardy justified the infusion of more funds for materials, supplies, and labor. (Plaintiff's Exhibit 32). This decision was only consistent with an orderly liquidation of ALC.

28. On October 24, 1975, defendant advanced $18,073.73 to ALC; said advance was evidenced by a demand promissory note dated October 24, 1975, in the principal amount of $18,073.73, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was given number 151529 by defendant. Of the proceeds of said advance, $15,255.87 was credited to the general checking account of ALC and $2,817.86 to the payroll account. (Plaintiff's Exhibit 89). Those amounts covered ALC checks drawn upon the accounts which defendant agreed to pay as a part of the orderly liquidation of ALC.

29. On October 27, 1975, defendant advanced $14,954.22 to ALC. The advance was evidenced by a demand promissory note dated October 27, 1975, in the principal amount of $14,954.22, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 151565 by defendant. All of the advance was credited to the general checking account of ALC. (Plaintiff's Exhibit 89). That amount covered ALC checks drawn upon the account which defendant agreed to pay as a part of the orderly liquidation of ALC.

30. On October 28, 1975, defendant advanced $23,388.40 to ALC. The advance was evidenced by a demand promissory note dated October 28, 1975, in the principal amount of $23,388.40, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 151592 by defendant. Of the proceeds of the advance, $13,119.41 was credited to the general checking account of ALC, $2,270.14 to the payroll account of ALC, and $7,998.85 cannot be traced. (Plaintiff's Exhibit 89). The advance covered ALC checks drawn upon said accounts which defendant agreed to pay as a part of the orderly liquidation of ALC.

31. On November 4, 1975, defendant advanced $131,372.55 to ALC. The advance was evidenced by a demand promissory note dated November 4, 1975, in the principal amount of $131,372.55, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 151783 by defendant. All of the proceeds of the advance was credited to the general checking account of ALC. (Plaintiff's Exhibit 89). The advance covered ALC checks drawn upon said account which defendant agreed to pay as a part of the orderly liquidation of ALC.

32. On November 4, 1975, defendant advanced $600.00 to ALC; said advance was evidenced by a demand promissory note dated November 4, 1975, in the principal amount of $600.00, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 151840 by defendant. The proceeds of the advance cannot be traced. (Plaintiff's Exhibit 89). The advance covered ALC checks drawn upon said account which defendant agreed to pay as part of the orderly liquidation of ALC.

33. On November 5, 1975, defendant advanced $2,890.64 to ALC. The advance was evidenced by a demand promissory note dated November 5, 1975, in the principal amount of $2,890.64, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 151839 by defendant.

The proceeds of the advance cannot be traced. (Plaintiff's Exhibit 89). The advance covered ALC checks drawn upon said accounts which defendant agreed to pay as part of the orderly liquidation of ALC.

34. On November 10, 1975, defendant advanced $74,152.45 to ALC. The advance was evidenced by a demand promissory note dated November 10, 1975, in the principal amount of $74,152.45, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 151934 by defendant. Of the proceeds of the advance, $2,695.86 was credited to the general checking account of ALC and $71,456.59 to the payroll account. (Plaintiff's Exhibit 89). The advance covered ALC checks drawn upon said accounts which defendant agreed to pay as part of the orderly liquidation of ALC.

35. On November 18, 1975, defendant advanced $77,578.75 to ALC. The advance was evidenced by a demand promissory note dated November 18, 1975, in the principal amount of $77,578.75, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 152174 by defendant. Of the proceeds of the advance, $58,241.33 was credited to the general checking account of ALC and $19,337.42 to the payroll account. (Plaintiff's Exhibit 89). The advance covered ALC checks drawn upon said accounts which defendant agreed to pay as part of the orderly liquidation of ALC.

36. On December 2, 1975, defendant advanced $100,000.00 to ALC. The advance was evidenced by a demand promissory note dated December 2, 1975, in the principal amount of $100,000.00, with ALC as obligor, defendant as obligee, and interest at the rate of 0.0%. (Plaintiff's Exhibit 68). The note was numbered 152428 by defendant. Of the proceeds of the advance, $75,000.00 was credited to the general checking account of ALC and $25,000.00 to the payroll account. (Plaintiff's Exhibit 89). The advance covered ALC checks drawn upon said accounts which defendant agreed to pay as part of the orderly liquidation of ALC.

37. All the advances referred to in paragraphs 28 through 36, inclusive, were used to pay suppliers, materialmen and laborers in connection with the Lame Deer, Montana project, other projects where failure to pay suppliers, materialmen or laborers would jeopardize the value of an account receivable in which defendant had a security interest or for ALC payroll for personnel critical to the handling of the orderly liquidation of ALC. At least $127,000.00 of said advances were used on or about November 18, 1975, to pay materialmen and suppliers in connection with the Lame Deer project (Plaintiff's Exhibit 62), and $33,783.78 of said advances were used to pay Aetna Oak–Mak laborers working on said Lame Deer project between October 17, 1975, and December 7, 1975.

38. Commencing on October 24, 1975, and at all times thereafter, the advances made to ALC referred to in paragraphs 28 through 36, inclusive, were interest–free or in banking trade and custom at "zero accrual" inasmuch as defendant knew ALC would not be able to pay interest. This was only consistent with orderly liquidation of ALC.

39. On October 24, 1975, defendant decided to not pay general unsecured creditors and at all material times thereafter adhered to that decision.

40. The business of ALC was closed the week of October 20, 1975. It opened briefly on October 26 and 27, 1975, and closed for the taking of a physical inventory on October 28, 29, and 30, 1975.

41. On October 24, 1975, ALC was in default on its obligations under its Letter Loan Agreement with defendant and was so advised by defendant by its letter to ALC dated October 24, 1975. (Plaintiff's Exhibit 32). Specifically, ALC defaulted under paragraph 8(c) because its net worth had become less than $800,000.00, the minimum amount set by paragraph 7(g); under paragraph 8(d) by reason of the requirement of paragraph 11(f) of the Security Agreement which was attached as Exhibit

E to said Loan Agreement; and under paragraph 8(j) because of the failure of ESOT to pay the principal and interest installment on its $1,000,000.00 loan when due on October 15, 1975. These defaults were formally brought to the attention of ALC by defendant on October 24, 1975. (Plaintiff's Exhibit 32).

42. On defendant's demand ALC between October 28 and 31, 1975 conducted a physical inventory of its lumber and millwork inventory located at its Minneapolis yard. It was performed under the supervision of Timothy Peterson. All inventory was counted, a unit cost price to ALC was determined and extensions made. The total value of the inventory on October 31, 1975 at cost was ascertained to be $670,971.38. (Plaintiff's Exhibit 73). The fair and reasonable value of such inventory was 15% over cost, or $771,617.00.

43. The fair and reasonable value of the inventory of ALC in its Minneapolis yard on October 24, 1975 was $771,617.00.

44. Defendant employed the accounting firm of Ernst & Ernst to oversee the taking of the physical inventory and paid its fee.

45. On or about October 30, 1975, ALC was operating under the supervision of defendant. ALC referred a telephone inquiry made by R. J. Long of the American Lumbermen's Credit Association, a trade credit organization, to defendant's officer Dingman. (Plaintiff's Exhibit 47). Dingman told Long that the business of ALC was continuing to the extent of fulfilling current contracts where it was necessary to supply additional material in order to protect the investment already made. (Ibid.). Dingman advised Long that ALC was not in a bankrupt situation. (Ibid.). Dingman advised Long that it was defendant's intention to run the liquidation on a completely orderly basis and that defendant did not view it as a fire sale situation.

46. On or about November 19, 1975, Dingman again received a telephone inquiry from Long of the American Lumbermen's Credit Association (Plaintiff's Exhibit 48). At that time, Dingman said ALC was not insolvent on the books, that ALC continued

to operate was still delivering material on uncompleted contracts, and that defendant was paying cash for a little material necessary to complete such contracts. (Ibid.).

47. During this conversation, Dingman represented that defendant was doing everything possible to salvage something for the unsecured creditors, and that the best evidence of this was the fact that defendant was giving ALC enough support to liquidate slowly, rather than on a quick sacrifice basis. (Ibid.).

48. The American Lumbermen's Credit Association disseminated the information received from defendant to one creditor. (Defendant's Exhibit 67).

49. On or about November 21, 1975, defendant gave written notice to ALC that it was foreclosing its security interest in inventory under its Security Agreement obtained on October 24, 1975. (Plaintiff's Exhibit 38).

50. On November 3 and 4, 1975, Dingman of defendant-bank and Timothy Peterson of ALC visited Lame Deer, Montana, for the purpose of inspecting the project to determine whether defendant should advance additional funds to complete the project. (Plaintiff's Exhibit 46). Dingman determined that the value of the account receivable which could be recovered by completing the contract was substantially in excess of the financial investment it would require. (Ibid.). Any value realized would under the then circumstances have redounded solely to the benefit of defendant.

51. A physical inventory of the inventory of ALC on hand at Lame Deer, Montana, was taken by Dingman and Peterson on or about November 3, 1975. Dingman received the only written report of that inventory, however, it was not produced at trial, nor was any oral testimony adduced regarding its indicated values.

52. On or about December 1, 1975, defendant had employed James Haney, formerly construction superintendent with ALC in charge of the Lame Deer project, to watch the inventory at the construction site. First National agreed to pay Haney

for his services, employed him through January 8, 1976, and paid him according to its agreement.

53. On or about December 9, 1975, Dingman and Haney, both agents of defendant, conducted a physical inventory of all inventory of ALC in the yard at Lame Deer, Montana. All pieces of inventory were counted by Haney, recorded by Dingman, and extended using prices determined from the subcontract between ALC and G. R. Construction Company. The total value of such inventory was $94,554.00. (Plaintiff's Exhibit 46). Dingman possessed a copy of the inventory, but it was not produced at trial. The fair and reasonable value of said inventory at Lame Deer, Montana, on December 9, 1975, was $94,554.00. The fair and reasonable value of the inventory at Lame Deer, Montana, on October 24, 1975, was not less than $94,554.00.

54. Commencing on or about December 5, 1975, defendant sold some ALC inventory in Minneapolis on a piecemeal basis for $29,031.05 and some on a bulk–sale basis for $317,722.83. The aggregate received for the Minneapolis inventory was $346,953.88, which was applied against the indebtedness of ALC to First National. (Plaintiff's Exhibit 39). Such inventory was the remainder of that inventories on October 31, 1975.

55. In January, 1976, First National sold some ALC inventory at Lame Deer, Montana, to G. R. Construction Company for $47,608.91 (Plaintiff's Exhibit 45), and the proceeds were applied against ALC indebtedness to First National. Said inventory was a portion of that inventoried by Dingman and Haney on or about December 9, 1975. No accounting was made by First National concerning disposition of the balance of the inventory.

56. First National sold all equipment of ALC on or about March 5, 1976, direct and through an auction sale. The gross sale proceeds were $56,941.40 and net sale proceeds realized after commissions and expenses was $47,436.77, all of which was applied to ALC indebtedness to defendant. (Plaintiff's Exhibit 40).

57. On or about October 24, 1975, Dingman for defendant and Lilja for ALC discussed the September, 1975 ALC Account Receivable Aging Report. (Plaintiff's Exhibit 26). All collections through October 17, 1975, were identified and bad debts and uncollectible items were identified. Total accounts receivable were $1,548,560.96 plus accrued interest of $13,227.76. Of the aggregate, $398,520.86 was deemed noncollectible or doubtful. Collections through October 17, 1975, were $248,745.61. The balance due from G. R. Construction for the Lame Deer project was $362,733.95. After subcontracting the noncollectible, doubtful, October collections and the G. R. Construction balance, Dingman and Lilja determined that $551,788.30 was the balance, including two projects representing $130,000.00 of which $30,000.00 was uncollectible. (Plaintiff's Exhibit 26). Defendant was concerned about the value of the accounts receivable which was less than the amount reflected on the books of ALC at all material times.

58. On or about October 24, 1975, defendant advised Lilja, Kulas and Peterson that it was not prepared to finance the salaries which each had been receiving from ALC as part of the entire original financial arrangement including ESOT. Those salaries had been established at sufficiently high levels (approximately $300,000.00 in the aggregate) that ALC contributions to ESOT (25% of salaries) would be adequate to meet the obligations of ESOT to defendant under its Loan Agreement. The salaries also had been utilized to make payments on the principals' personal indebtedness to defendant. On or about October 24, 1975, defendant told them it was prepared to pay lesser annualized salaries of approximately $30,000.00, $20,000.00, and $20,000.00, respectively, for their services. This was accepted and was a part of the orderly liquidation of ALC.

59. Checks were drawn about December 1, 1975 on the general checking account of ALC payable to Lilja in the sum of $2,190.00, Kulas in the sum of $2,190.00, and Peterson in the sum of $2,190.00. (Plaintiff's Exhibit 69). At defendant's demand,

each was endorsed to defendant and applied by it to reduce the personal loans of the three principals of ALC. Defendant approved the payment.

60. After October 23, 1975 neither ALC nor its officers or directors had control over the moneys of ALC or have any sources of funds with which to pay suppliers or general unsecured creditors. Defendant exercised absolute control over the use of the funds resulting from its advances to ALC as reflected by promissory notes given between October 24, 1975, and December 2, 1975. (Plaintiff's Exhibit 68).

61. Between October 24, 1975, and December 2, 1975, defendant advanced an aggregate of $442,810.74 to ALC. (Plaintiff's Exhibit 63). Between October 24, 1975, and December 10, 1975, defendant had received and credited to the indebtedness of ALC the aggregate sum of $410,092.34. By December 11, 1975, such credits totaled $466,187.81. (Ibid.). Such credits reflected the collection of ALC accounts receivable.

62. An Involuntary Petition in Bankruptcy against ALC was filed on February 11, 1976, and ALC was subsequently adjudicated bankrupt.

63. Defendant filed its Proof of Claim No. 37 for $1,781,382.69 in the resulting bankruptcy case. (Plaintiff's Exhibit 70). The claim included claimed indebtedness of $937,500.00 of ALC resulting from Guaranty of the ESOT indebtedness to defendant.

64. By receiving the proceeds of sales of inventory and equipment of ALC, defendant received proceeds which otherwise would have been available for payment of general unsecured creditors of ALC.

65. When the principals resigned on December 5, 1975, all the books and records of ALC were intact. Defendant changed locks and had sole and exclusive use of the offices of ALC and sole and exclusive access to and control over such records. To the extent any existent records of ALC were not available at trial, such resulted from defendant's failure to properly maintain custody of such books and records.

## CONCLUSIONS OF LAW

1. On October 24, 1975, ALC transferred security interests in inventory and equipment to defendant.

2. Said transfers occurred within four (4) months of the filing of the Involuntary Petition in Bankruptcy against ALC.

3. Said transfers were made to secure an antecedent debt of ALC to defendant.

4. Said transfers allowed defendant to obtain a higher percentage of the obligation of ALC to it than other creditors of the same class.

5. Such transfers occurred at a time that ALC was insolvent within the meaning of the Bankruptcy Act.

6. Defendant knew and had reasonable grounds to know of such insolvency.

7. Said transfers constituted voidable preferences under § 60 of the Bankruptcy Act.

8. Said transfers were made without fair consideration.

9. Said transfers were part of a design to liquidate ALC.

10. ALC and defendant knew ALC would incur debts which ALC would be unable to pay as they matured.

11. Said transfers were made with the intent to hinder, delay and defraud existing and future creditors of ALC.

12. Said transfers are recoverable by plaintiff under § 67(d)(2) of the Bankruptcy Act.

13. Said transfers were fraudulent as to existing and future creditors.

14. Said transfers were made in contemplation of the liquidation of ALC.

15. Said transfers were made with the intention to use the purported considerations therefor, to wit: future advances, to enable defendant to obtain a greater portion of the indebtedness of ALC to it than other creditors of the same class.

16. ALC and defendant knew and believed that ALC and defendant intended to make such use of the purported consideration.

17. Said transfers are recoverable by plaintiff under § 67(d)(3) of the Bankruptcy Act.

18. Plaintiff is entitled to judgment in the sum of $488,744.65; representing the aggregate of $346,753.88 received by defendant from the sale of ALC Minneapolis inventory, the $94,554.00 fair and reasonable value of Montana inventory which defendant took into possession on or about December 5, 1975, and the $47,436.77 received by defendant from the sale of equipment, together with interest thereon according to law from January 1, 1976, to the present.

19. On October 24, 1975, and at all material times thereafter, defendant had and exercised control over all aspects of the finances and operations of ALC including the following: payment of payables and wages, collection and use of accounts receivable and contract rights, purchase and use of supplies and materials, inventory sales, the lumber yard in Minneapolis, the salaries of the principals, the employment of employees, and receipt of payments for sales and accounts receivable.

20. The Guaranty by ALC of the ESOT indebtedness to First National was absolute and unconditional on and after October 15, 1975.

21. By reason of its exercise of control over ALC and its operation defendant had a duty and an obligation to deal fairly and impartially with ALC and its other unsecured creditors.

22. Defendant breached its duty by undertaking a course of liquidation that was designed solely to preempt from general unsecured creditors any portion of the value of the inventory and equipment of ALC and to thereby enhance the value of defendant's previously existing security interest in the accounts receivable and contract rights of ALC.

23. By reason of said breach of fiduciary duty to the creditors of ALC, defendant's claim shall be subordinated to the claims of general unsecured creditors in the interest of equity.

ORDER FOR JUDGMENT

Let judgment be entered accordingly.