1926

PEOPLES FEDERAL SAVINGS & LOAN ASSOCIATION, Respondent v. MYRTLE BEACH GOLF & YACHT CLUB, A General Partnership, Myrtle Beach Golf & Yacht Club, Inc., A South Carolina Corporation, MBG&YC II, Inc., Formerly Known As Peoples Joint Venture Group, Inc., Myrtle Beach Golf & Yacht Club Association, Inc., Teatros Y Cinemas, S.A., A Panamanian Company, American Community Development Group, Inc., F/K/A/ Justice Investment Corp., John A. Hinson, Individually and as Trustee of West Coast Pension and Profit Sharing Trust, Sears Roebuck & Co., Universal Resort Travel, Inc., D/B/A/ A-Port-of-Call Travel Agency, Stan Parker, Ed Hudson, Austin Kelly Advertising, Inc., POA Acquisition Corp., D/B/A Peterson Outdoor Advertising of South Carolina, Custom Glass, Inc., The Parnell-Martin Companies, Inc., Loyola Federal Savings & Loan Association, Equipment Leasing, Division of American Federal Bank, FSB, Chambers of South Carolina, Williams Trucking Co., Inc., Palmetto Turf Farms, Inc., Danny Player, D/B/A Players' Landscaping, Whaley Corp., D/B/A Socastee Hardware Store, Cornelius Toomey, Individually and for the Benefit and on Behalf of all other Similarly Situated, and Midway Nursery, Inc., Defendants, of whom American Community Development Group, Inc., F/K/A Justice Investment Corp., & John A. Hinson, Individually and as Trustee of West Coast Pension and Profit Sharing Trust are, Appellants. Appeal of AMERICAN COMMUNITY DEVELOPMENT GROUP, INC.

(425 S.E. (2d) 765)

Court of Appeals

*Dalton B. Floyd, Jr.* of *Floyd & Prevatte,* Surfside Beach, *for appellants.*

*Michael W. Battle* of *Lovelace & Battle,* Conway, *for respondent.*

Heard Jan. 22, 1992; Decided Dec. 14, 1992.

Reh. Den. Jan. 28, 1993.

CURETON, Judge:

This case arose from a real estate development project in Horry County, South Carolina. The project involved the acquisition of several tracts of land for development, construction, and eventual leasing and sale of lots, single-family dwellings, and multifamily dwellings. The project was to be developed in several phases. The project also included a proposed golf course, club house, tennis courts, and swimming pool. The two main actors in the development of the project were (1) George Magrath, Jr., an executive vice president of Peoples Federal Savings & Loan Association (Peoples); and (2) R.L. Propps, a real estate developer, president of Justice, Inc., and president of Cheezem Development Corporation (Cheezem). The appellant, American Community Development Group, Inc., is the successor corporation to Cheezem.

Peoples commenced this foreclosure action against Myrtle Beach Golf and Yacht Club, a general partnership, and the other named defendants in September 1988. The appellants, American Community Development Group, Inc. (ACDG) and John A. Hinson,[1] individually and as trustee of West Coast Pension and Profit Sharing Trust, also hold a mortgage on the property. They filed an answer denying the material allegations of the complaint. By way of counterclaim, ACDG asserted Peoples was individually liable to it for the debt secured by its mortgage under several theories of lender liability. ACDG also sought equitable subordination of Peoples's mortgage to its mortgage. Peoples replied, *inter alia,* (1) ACDG had sued and later settled with the partnership; (2) the settlement provided for a mortgage to be given by the partnership to ACDG; and (3) the express terms of the mortgage made it inferior to Peoples's mortgage. Peoples further al-

---

[1] Hinson owns an interest in ACDG's note and mortgage. For purposes of this decision, Hinson's interest is considered with that of ACDG and they are referred to in the singular.

leged ACDG was estopped, judicially and collaterally, to assert that its mortgage was superior. Peoples also denied it was liable under any of the theories of lender liability and alleged ACDG waived its right to assert the superiority of its lien. The master ordered the mortgage held by Peoples foreclosed as a first lien. We affirm.

## FACTS

Prior to February 24, 1984, Justice, Inc., through its president, R.L. Propps, approached Peoples about the development of some land in Myrtle Beach, South Carolina. The development concept would oblige Peoples to provide the funding to purchase and develop the land through loans. In return, Peoples would share in the potential profits from the development through a wholly owned subsidiary service corporation. In furtherance of this plan Peoples incorporated a wholly owned subsidiary, Peoples Joint Venture Group, Inc. (Peoples Venture). Justice, Inc. incorporated Myrtle Beach Golf and Yacht Club, Inc. (MBGYC, Inc.). Those two corporations together formed the partnership known as Myrtle Beach Golf and Yacht Club on February 28, 1984. Peoples Venture owned twenty-five (25%) percent of the partnership and MBGYC, Inc. owned the remaining seventy-five (75%) percent. Profits and losses were to be shared in proportion to the ownership interests of the partners. The partnership agreement provided each partner would make initial capital contributions of one hundred dollars. Finally, the agreement provided the monies for acquisition and development costs would be borrowed by the partnership from "an affiliate of Peoples [Joint Venture]."

On February 29, 1984 MBGYC, Inc. assigned to the newly formed partnership its option to purchase tracts I and II of the land to be developed.[2] At the time of the exercise of the option to purchase, the seller offered the partnership one million ($1,000,000) dollars to release the seller from the option. The partnership refused the offer. Thus, at the inception of

---

[2] The option provided for the purchase of 1,032 acres of land at a purchase price of $6,000 per acre. The optionor had the right to take title to the land over a period of time in separate tracts. Other land was involved in the development. It is unclear whether options to purchase the other land were also assigned at the time.

the partnership relationship, Peoples contributed to the partnership its commitment to provide financing for the development while Justice, Inc. provided development expertise, plans that had been approved by appropriate government agencies and an option with considerable value.

Tracts I and II of the property represented the first phase of construction of the development. Tract I was to contain single- and multiple-family homes. Tract II was the amenities tract and the land on which an eighteen-hole golf course, tennis courts, and swimming pool were to be built. The amenities tract is the subject of this foreclosure.

On February 29, 1984, Peoples made two loans to the partnership totaling $4,500,000. One loan of $3,000,000 appears to have been primarily used for the acquisition and development of the amenities tract. On August 27, 1984, Peoples made a loan to the partnership in the amount of $350,000. On September 20, 1984, Peoples made another loan to the partnership in the amount of $1,800,000. These funds were advanced for the purposes of acquiring the property and for construction and development costs. Construction began; roads were built; electrical, water, and sewage disposal facilities were constructed. According to Magrath's testimony, things were going well. With the exception of the $3,000,000 amenities loan, virtually all of these other loans have either been repaid or extinguished through foreclosure.

Sometime after June 1985, Cheezem Development Corporation decided it would buy the majority of Propps's developments.[3] Arthur Andersen was retained to develop a plan to effectuate these purchases. Merrill-Lynch Capital Corporation was to finance the purchases. Cheezem had an appraisal done of the partnership's properties as of August 1, 1985. The appraisal indicated a net value of $14,100,000. Propps testified his company figured the project had a net value of about ten to twelve million dollars on August 9, 1985.

On August 9, 1985, Peoples sold all of its stock in Peoples Venture to Propps for the sum of $403,000. To secure the pay-

---

[3] Propps owned an interest in several developments. Additionally, Propps and his associate owned the controlling interest in Cheezem. Although there is some question of the wisdom and/or propriety of the purchase of Propps's interest in the partnership, the record does not show that Cheezem was precluded from authorizing the purchase.

ment of the purchase price, Propps and the partnership gave Peoples a note and mortgage for the full purchase price. Interest on the note and mortgage was delayed until maturity. Payments were to be made from mortgage lot releases on Phase II of the development. The stock purchase price was established by estimating the profit Peoples Venture would have received from Phase II had it stayed in the project. The master found the $403,000 represented the fair market value of the stock and the stock sale was bona fide. ACDG claims the stock's value did not even approach $403,000 and the sale was simply a scheme to remove Peoples from the partnership, yet ensure it continued to receive profits from the project.

Propps testified that while he was not satisfied with the purchase price and Peoples refused to negotiate regarding it, he thought it was nevertheless fair. He further testified the main bone of contention regarding the negotiations was the deferral of interest. Peoples had insisted on no deferral, but eventually agreed to a deferral of all interest until the principal was payable. Magrath confirmed the fact the deferral of interest was the main bone of contention in the sale and testified the price was fair.

On August 13, 1985, Loyola Federal Savings became the major lender for the project by committing to lend the partnership $13,000,000 for the construction of housing. The focus of Peoples then turned to financing the development of the golf course and amenities tract. Thereafter on October 9, 1985, Peoples loaned the partnership $5,100,000. The $3,000,000 amenities loan from 1984 was refinanced from this loan.

On September 30, 1985, ACDG, in furtherance of its predecessor's plan to purchase Propps's interest in the partnership, transferred $257,000 to MBGYC, Inc. On October 2, 1985, an additional $493,000 was wired to Justice, Inc. Both of these corporation were controlled by Propps. On October 30, 1985, ACDG wired $150,000 to Justice, Inc. ostensibly as operating expenses for the partnership.

In January of 1986, Propps and his partner, Dale Murray, had a disagreement relative to the acquisition of the Myrtle Beach project and another development. As a result, ACDG decided to cancel the purchase of the Myrtle Beach project. After extended negotiations, Justice, Inc. signed an open note to repay ACDG $750,000 and the partnership signed an open

note to repay ACDG the $150,000 allegedly advanced to it.[4] Justice, Inc. and the partnership defaulted in the payment of the notes.

Early in December 1985, construction slowed down and eventually came to a halt around April, 1986. Construction was resumed on June 30, 1986. During this period, the partnership was involved in various lawsuits, including several to establish attachments and liens against the partnership.

In June 1986, Myrtle Beach Holding Corporation bought the interest of Propps and Justice, Inc. in the partnership. At that time $1,800,000 was infused into the project. About the same time, ACDG put the partnership into involuntary bankruptcy. Pursuant to order of the bankruptcy court, Peoples operated the golf course until February 13, 1989. At that time, Ted Miller, an employee of Peoples, was appointed receiver to operate the golf course as part of the instant foreclosure proceeding.

On March 12, 1987, ACDG brought suit against Propps, Justice, Inc., and the partnership to recover on the two notes. The suit was settled by a court-approved agreement. The agreement provided the partnership would sign a new note and give ACDG a mortgage lien on all property owned by the partnership. The partnership and Propps confessed judgment to ACDG for $900,000. The mortgage to ACDG expressly provided that it "is junior and subordinate to the lien of [Peoples], together with any extensions and/or renewals thereof."

## DISCUSSION

Because the predominate issues involved in this appeal are equitable, we review the evidence to determine the facts in accordance with our own view of the preponderance of the evidence. 12 S.C. Juris. *Equity* § 29 (1992). While this standard permits us a broad scope of review, we will not disregard the findings of the master who saw and heard the witnesses and was in a better position to evaluate their credibility. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 391 S.E. (2d) 538 (1989).

---

[4] The record does not reflect that any of $900,000 transferred by ACDG to entities controlled by Propps ever actually got into the coffers of the partnership and benefitted it. Propps admitted he transferred partnership money to his other projects.

We note first the several theories of lender liability advanced by ACDG, though distinct in theory, are overlapping and blurred as they have been applied by the courts.

## I.
### Participation/Involvement
### Theory of Liability

ACDG argues Peoples's participation and involvement in the construction and marketing of the project was so pervasive as to amount to lender involvement that was "not normal commercial practice for a lender." Therefore, it asserts, Peoples should be held liable for the debt owned ACDG by the partnership. We disagree.

The partnership agreement provided MBGYC, Inc. would be the managing general partner, but gave Peoples Venture veto authority over major management decisions as defined in the agreement. Both Propps and Magrath testified Peoples Venture did not participate in any major management decisions before or after August 9, 1985.

In the case of *Kennedy v. Columbia Lumber and Mfg. Co., Inc.*, 299 S.C. 335, 384 S.E. (2d) 730 (1989), our supreme court discussed the theories by which a lender may incur implied warranty liability to the purchase of a home acquired by the lender after the debtor defaults. The court stated, *inter alia,* "[l]iability may also attach when the lender becomes highly involved with construction in a manner that is not normal commercial practice for a lender." *Id.* at 340, S.C. (2d) at 734. Also, in *Roundtree Villas Ass'n Inc. v. 4701 Kings Corp.*, 282 S.C. 415, 423, 321 S.C. (2d) 46, 51 (1984), our supreme court held that when a lender, in effect, took over a construction project and "undertook to market the units through a corporation it had created and when it undertook to repair defects which existed to promote sales, a common law duty to use due care arose." In such a case the lender can be said to have become the developer. *See Kennedy v. Columbia Lumber,* 299 S.C. 335, 384 S.C. (2d) 730.

The *Roundtree Villas* case was careful to point out the lender would not incur liability for defects in construction occurring prior to the time it became involved in the construction repair and management of the project. Inferentially, a lender also will not be held liable for defects or injury occur-

ring after it in good faith removes itself from the project, unless the defects or injury may be traced to its prior involvement. In the instant case, ACDG claims Peoples was a participant or partner in the partnership from the date of formation and never in good faith removed itself from that status. Therefore, it argues the $5,100,000 loan was an investment in the partnership and not a loan. To fully explore this argument we must consider the posture of Peoples vis-a-vis the partnership before and after August 9, 1985, the date of the stock sale.

The master concluded the facts did not warrant piercing the corporate veil of Peoples Venture so as to make Peoples, its sole shareholder, a partner in the partnership. ACDG vigorously contends the criteria for disregarding corporate existence, as announced in this court's decision in *Sturkie v. Sifly*, 280 S.C. 453, 313 S.E. (2d) 316 (Ct. App. 1984), are present, in this case. Specifically, it points out Peoples Venture was undercapitalized, failed to observe corporate formalities, had no office separate from Peoples, had the same directors as Peoples, and was used as a mere facade to carry on the business of Peoples. While these factors are present here to some degree, they represent only the first prong of the *Dewitt*[5] test adopted in *Sturkie*. The second prong requires that there be an element of injustice or fundamental unfairness should the separate corporate existence of Peoples Venture not be disregarded. The corporate form may be disregarded only where equity requires the action to assist a third party. *Id.* at 458, 313 S.E. (2d) at 319. To establish fundamental unfairness, ACDG must show (1) Peoples was aware that ACDG had a claim against the partnership, and (2) thereafter acted in a self-serving manner with regard to the property of the partnership and in disregard of ACDG's claim against the property. *Id.* at 455, 313 S.E. (2d) at 319. At the time of the stock sale and the $5,100,000 loan, Peoples was unaware of any claim by ACDG.[6] ACDG has not convinced us the requisite injustice or unfairness is present here. We,

---

[5] *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F. (2d) 681 (4th Cir. 1976).

[6] In fact, the purported advancement of $150,000 to the partnership occurred on October 30, 1985, after both of these events.

therefore, refuse to pierce the corporate veil of Peoples Venture.

Although we refuse to pierce the corporate veil of Peoples Venture, Peoples may nevertheless be liable for the debt of the partnership after August 9, 1985, if it was an active participant in the partnership in the construction, management and marketing of the development. ACDG points out several areas of involvement by Peoples with the partnership which it claims were highly abnormal commercial practices for a lender. They include (1) undercapitalization of the partnership; (2) advancement of money to the partnership after construction stopped; (3) guaranty of payments to subcontractors; (4) retention of an interest in the profits in Phase II of the project through the stock sale; (5) communication with the homeowners association concerning homeowner concerns about the project; (6) issuance of checks payable directly to subcontractors; (7) advancement of $28,000 on one occasion to fund the partnership's payroll; (8) involvement in efforts to sell the project; and (9) letters to government agencies requesting approval or sanction of the project. Further, ACDG presented expert testimony that the involvement by Peoples in the project constituted abnormal commercial practices. Additionally, ACDG points out other areas of involvement by Peoples. However, these other involvements occurred pursuant to court order or after default and under the default provisions of the mortgage in foreclosure.[7] We, thus, find them unpersuasive on the issues before us.

As pertains to the issues of (1) advancing money to the partnership after construction stopped, (2) guaranteeing payments to subcontractors, (3) issuing checks directly payable to subcontractors, and (4) advancing $28,000 to fund a weekly payroll, it is implicit the actions were taken at the behest of with the approval of the partnership. In fact, there is a letter in the record from the partnership to Peoples requesting the $28,000 advance on an emergency basis the primary lender, Loyola Federal Mortgage Company, was snowed in and could not get the payroll money to the partnership on time. As relates to the undercapitalization of the partnership, it is true most authorities consider this a significant circumstance in

---

[7] We do not find these provisions unusual in commercial mortgages.

imposing liability on a corporate organizer who grossly under-capitalizes. See Harry G. Henn, *Law of Corporations* 257 (2d ed. 1970). Here, however, Peoples did provide the major funding needs of the partnership, at least until the development outpaced its resources. We also note that Propps, the agent for ACDG's predecessor corporation, was a party to any undercapitalization. Additionally, there is ample evidence to suggest the major reason the project failed was not undercapitalization, but rather the fact Propps siphoned money away from the Myrtle Beach project to invest in other projects. Finally, as discussed later, Peoples effectively removed itself from any ownership interest in the partnership prior to ACDG's investment in it. We see no causal relationship between the initial capitalization and ACDG's injury.

We are also unpersuaded the August 9, 1985, stock sale was a scheme to enable Peoples to remove itself from the project yet to insure it continued to receive profits from it. In support of this claim, ACDG points out (1) the purchase price was based on the projected profits Peoples would have received from Phase II had it stayed in the project; (2) Peoples accepted a note and mortgage for the entire stock purchase price; (3) partnership property was mortgaged to secure the note; (4) interest payments on the note were delayed until maturity; (5) the project was in trouble in August 1985 and had no monies; and (6) Peoples never reflected the note as a receivable on its books.

The record does not reflect Peoples coerced Propps in any way into purchasing its stock.[8] In fact ACDG's expert testified and the record reflects Propps manipulated Peoples. There is some question about the project's worth on August 9, 1985. If we are to accept the appraisal obtained by ACDG's predecessor, it was worth as much as $14,000,000 at that time. Peoples Venture's one-fourth interest would have thus far exceeded the stock sales price. While acknowledging Peoples refused to negotiate the stock sales price, Propps nevertheless thought the price was fair. Although acknowledging the partnership had no monies in August 1985, Propps testified the partner-

---

[8] Correspondence from Peoples to the partnership in August, 1985 indicates Peoples was considering a sale of its stock to other entities, to include Loyola Federal Savings at the same purchase price.

ship had presales of homes in the range of twelve to fifteen million dollars with over a million dollars in earnest money on deposit in its trust account. The evidence suggests Propps was willing to pay Peoples its price for the stock because he intended to sell the project to Cheezem Development Corporation in any event.[9]

Magrath testified Peoples had no ulterior motive in removing itself from the partnership. He testified the project developed so rapidly, Peoples could not keep pace with the partnership's financing requirements. Thus, pursuant to a bail-out provision in the partnership agreement, it withdrew from the partnership.[10] Magrath maintained the purchase price was fair and offered plausible explanations for accepting a note for the full purchase price and not entering the sale as a receivable on Peoples's books.[11] Moreover, ACDG's predecessor corporation through its agent Propps was fully aware of this transaction prior to ACDG's investment in the partnership. The master necessarily made credibility determinations in finding the sale was an arm's-length transaction. On these facts, ACDG has failed to demonstrate fraud, overreaching, lack of consideration, misrepresentation, or bad faith in the August 9, 1985 sale. We sustain the master's finding on this point.

As relates to (1) Peoples's involvement with the homeowners association, (2) its partnership in negotiations to sell the project, and (3) correspondence requesting approval from

---

[9] Propps testified: "The reason it was put on as a participation—that was to say Five Hundred Dollars a unit—was because I was buying the benefit of another deal . . . And I certainly wasn't going to pay for something that they were going to get the profits from. So that's why it's tacked on as a cost of it. The Myrtle Beach Golf and Yacht Club Partnership as opposed to me writing a check for Four Hundred and Three Thousand Dollars. I had told them that it was going to be owned by Cheezem."

[10] The partnership agreement provides that should Peoples Venture decide not to jointly develop tracts 3 through 10 or is unable to "cause to be provided acquisition and development financing," the partnership may proceed to develop the tracts and Peoples Venture shall have no further rights or obligations with respect to them.

[11] An internal bank memorandum dated November 20, 1984 indicates a proposed regulation of the Federal Home Loan Bank Board advises that when a bank takes an equity position in an acquisition, development and construction loan, "the transaction would be accounted for on the Association's books as an investment rather than as a loan . . . until the project was completed and sold." The effective date of the proposed regulation was October 28, 1984, several months after Peoples acquired its alleged equity position in the partnership.

government agencies, we find these activities are not unusual under the circumstances. As a lender Peoples was interested in getting the project approved and seeing it succeed. Its involvement with the homeowners association was as a lender responding to the association's inquiry about the status of the project. When it became apparent the project needed the infusion of money, Peoples participated in discussions to find a new purchaser primarily because it was being asked to substantially discount its debt. There is no indication Peoples actually proceeded on its own to locate potential purchasers. Finally, the letters written by Peoples to government agencies occurred in 1984.

In summary, we see the involvement by Peoples with the project as that of a local lender who had initially lent its name and resources to the project and did not want to see it fail. When Peoples determined the project would overwhelm its funding capabilities, it decided to step aside and let another lender provide the funding. In August 1985, it removed itself from an ownership position in the project by the sale of the stock of its subsidiary but agreed to complete the financing of phase I of the development. We do not think these actions should require it to be responsible for a debt incurred by the partnership long after Peoples removed itself from an ownership interest in the partnership. Peoples's involvement in the affairs of the partnership after August 9, 1985, does not approach the involvement of the lender in the affairs of the builder in *Roundtree*. Finally, we observe ACDG's loss of its investment which gave rise to its mortgage was (1) not related to Peoples's activities in any way; (2) occurred during a time when Peoples was impotent to affect the actions of Propps or the partnership; and (3) was the direct result of ACDG's dealings with its own agent Propps. Equity will not under such circumstance burden Peoples with the partnership's debt to ACDG.

## II.
### Principal/Agent Theory of Liability

Agency is a fiduciary relationship which results from the manifestation of consent by one person to another to be subject to the control of the other and to act on his behalf. Restatement (Second) of Agency § 1 (1958). An

agreement may result in the creation of an agency relationship although the parties did not call it an agency and did not intend the consequences of the relationship to follow. Agency may be proved by circumstantial evidence showing a course of dealing between the two parties. If requisite facts exist to prove a principal/agent relationship, this theory has been used to hold a lender liable for the debts of a borrower. 10 S.C. Juris. *Banks and Banking* § 171 (1992).

The master found Peoples did not exercise the degree of control necessary to hold it liable to ACDG under the principal/agent theory of lender liability. The case of *A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W. (2d) 285 (Minn. 1981), is most often cited for imposing liability upon this theory. In that case a lender was found liable to other creditors for the indebtedness of a borrower when the borrower collapsed after Cargill withdrew financing. The court stated:

> We deal here with a business enterprise markedly different from an ordinary bank financing since Cargill was an active participant in Warren's operations rather than simply a financier. Cargill's course of dealing with Warren was, by its own admission, a paternalistic relationship in which Cargill made the key economic decisions and kept Warren in existence.
>
> Although considerable interest was paid by Warren on the loan, the reason for Cargill's financing of Warren was not to make money as a lender but, rather, to establish a source of market grain for its business.

*Id.* at 292, 293.

The Restatement (Second) of Agency § 14(O) (1958) supports the concept of lender liability under the agency theory where the lender takes control of its borrower. Comment (a) to § 14(O) states:

> A security holder who merely exercises a veto power over the business acts of his debtor by preventing purchases or sales above specified amounts does not thereby become a principal. However, if he takes over management of the debtor's business either in person or through an agent, and directs what contracts may or may not be made, he becomes a principal, liable as any principal for

the obligations incurred thereafter in the normal course of business by the debtor who has now become his general agent. The point at which the creditor becomes a principal is that at which he assumes *de facto* control over the conduct of his debtor, whatever the terms of the formal contract with his debtor may be.

ACDG argues Peoples had total control of partnership business affairs both before and after August 9, 1985. In support of this argument it again stresses many of the points discussed in the preceding discussion. Unlike the *Cargill* case, Peoples did not abandon financing of the project. Instead, it accommodated the project by lending monies even after it withdrew from the partnership. ACDG offered no evidence that Peoples made any operational recommendations or suggestions to the partnership on construction and development matters after August 9, 1985. Peoples's actions of guaranteeing payments to two subcontractors and making other credit accommodations to the partnership were taken primarily to protect its collateral. We hold the actions of Peoples after August 9, 1985, do not demonstrate it made key decisions regarding or had *de facto* control over the conduct of the partnership. *Id.*

## III.
### Joint Venture Theory of Liability

A joint enterprise exists where there are two or more persons united in the joint prosecution of a common purpose under such circumstances that each has authority, express or implied, to act for all in respect to the control of the means and the agencies employed to execute such common purpose. *Long v. Carolina Baking Co.,* 190 S.C. 367, 3 S.E. (2d) 46 (1939). Further, in order to constitute a joint enterprise, there must be a common purpose and community of interest in the object of the enterprise and an equal right to direct and control the conduct of each other with respect thereto. *Spradly v. Houser,* 247 S.C. 208, 146 S.E. (2d) 621 (1966).

ACDG relies on the often cited case of *Central Bank N.A. v. Baldwin,* 94 Nev. 581, 583 P. (2d) 1087 (1978), for support of its argument. In *Central Bank,* the Nevada Supreme Court

concluded a joint venture existed where purchasers of several apartment complexes sued the lender, Central Bank, as a joint venturer with the building contractor for construction defects. After the lender had approached the builder to "joint venture" some construction projects, the lender arranged to have its wholly owned subsidiary form a new construction corporation with the builder. The Nevada court held the lender was engaged in a joint venture for profit with the building contractor because its subsidiary owned half of the construction company's stock and the lender had approached the contractor to joint venture the construction project.

Having concluded (1) the corporate veil of Peoples Venture should not be pierced; (2) the stock transfer from Peoples to Propps was legitimate; and (3) after August 9, 1985, Peoples had no interest in or control over the partnership except as a lender, we now hold ACDG may not recover under the joint venture theory.

## IV.
### Instrumentality or Alter Ego Theory

Under this theory of liability, when a lender controls the business decisions and actions of its borrower, the borrower becomes the instrument or alter ego of the lender. 10 S.C. Juris. *Banks and Banking* § 170 (1992); *see also Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F. (2d) 1098 (5th Cir. 1973).

In the *Krivo* case, the Fifth Circuit Court of Appeals gave expression to the elements of an instrumentality or alter-ego theory. The court stated the control required for liability under the "instrumentality" doctrine amounted to total domination of the subservient corporation manifested no separate corporate interests of its own and functioned solely to achieve the purpose of the dominant corporation. *Id.* at 1106. The court noted the instrumentality theory would not apply even in the presence of "total domination" without some misuse of control by the dominant corporation resulting in injustices or inequitable consequences. *Id.*

It is evident that after August 9, 1985, Peoples did not exercise control over the business and financial affairs of the partnership to such an extent that the partnership became its mere alter ego. Certainly, Peoples did not totally dominate

the partnership, nor engage in conduct resulting in inequitable consequences to ACDG. Further, it has not been shown that Peoples used its influence in such a way as to benefit itself at the expense of ACDG or other creditors.[12] For these reasons and the reasons stated in the previous discussion in Part I, we refuse to impose liability on Peoples based on the instrumentality and/or alter ego theory.

## V.
### Equitable Subordination

Finally, ACDG argues the mortgage lien of Peoples should be subordinated to its mortgage lien under the doctrine of equitable subordination. Equitable subordination is a remedy often sought in the bankruptcy court.[13] Under this doctrine, a shareholder's claim as a creditor to property of the bankrupt corporation may be subordinated to the claims of other creditors of the bankrupt when the debt to the shareholder is not a bona fide debt. *Taylor v. Standard Gas and Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). ACDG claims the loan of Peoples under foreclosure was simply an investment and not a bona fide debt. On the other hand, Peoples asserts the loan was bona fide and it had divested itself of all control and interest in the partnership prior to the time the loan was made. We find ACDG's position to be without merit.

The case of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), states the basis for application of the doctrine:

> [These cases] involve simply the question of order of payment. At times equity has ordered disallowance or subordination by disregarding the corporate entity. That is to say, it has treated the debtor-corporation simply as a part of the stockholder's own enterprise, consistently with the course of conduct of the stockholder. But in that situation as well as in the others to which we have referred, a sufficient consideration may be simply the violation of rules of

---

[12] The record does not indicate any other creditor complains about the conduct of Peoples.

[13] "The Bankruptcy Act of 1978 provides two remedies to a wronged borrower: equitable subordination and an action for a preference." 10 S.C. Juris. *Banks and Banking* § 173 at p. 137 (1992).

fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors. He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate devise avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For the power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

*Id.* at 310, 311, 60 S.Ct. at 246-47, 247.

In *Matter of Multiponics, Inc.*, 622 F. (2d) 709 (5th Cir. 1980), the Fifth Circuit Court of Appeals "re-articulated" the test for determining equitable subordination in the bankruptcy setting: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *Id.* at 713.

The linchpin in the decisions applying the doctrine of equitable subordination is the conviction that insider misconduct caused injury to the creditors of a bankrupt corporation. *See In re American Lumber Co.*, 7 B.R. 519 (Bankr. Minn. 1979); 10 S.C. Juris. *Banks and Banking* § 173 (1992). Here, the evidence does not show Peoples was an insider after August 9,

1985. Moreover, ACDG has not convinced us Peoples engaged in any inequitable conduct before or after Aug. 9, 1985, or the activities of Peoples injured ACDG or any other creditor. Thus, even if we were to apply the doctrine in this case, it would be of no avail to ACDG.

## OTHER BASES FOR AFFIRMANCE

We find it difficult to understand the equity of ACDG's position in view of the fact the record shows ACDG's mortgage lien emanates solely from its investment of funds to purchase Propps's ownership of the partnership. Thus, assuming Peoples's loan was an investment, as between the two investments, we know no rule of equity that would require the subsequent investment to receive priority over the prior investment. Furthermore, it seems to us that where the bulk of Peoples's loan proceeds were utilized in the development of partnership property, equity would require that loan to be repaid prior to ACDG's investment since it is doubtful whether any significant portion of ACDG's investment ever made it to the partnership's coffers.[14]

We also note ACDG should be estopped to complain of the priority of Peoples's mortgage where ACDG's mortgage expressly provides it is subordinate to the bank mortgage. Ordinarily, one who accepts a mortgage with a provision that it is subordinate to a prior mortgage is estopped to deny the superiority of the prior mortgage. *Mark v. Maberry*, 222 Ark. 357, 260 S.W. (2d) 455 (1953); 31 C.J.S. *Estoppel* § 39 (1964). This species of estoppel is often referred to as estoppel by deed as distinguished from equitable estoppel or estoppel in pais. *Territory of Alaska v. Guerin*, 140 F. Supp. 440 (D. Alaska 1956); see 7 S.C. Juris. *Estoppel and Waiver* §§ 6-14 (1991); see 15 Words and Phrases *Estoppel by Deed* (1950 and Supp.).

As a corollary to the preceding conclusion, we observe that but for the settlement between ACDG and Propps, ACDG would have no mortgage. ACDG should not on the one hand

[14] We observe that while all of the partnership's property was mortgaged to secure ACDG's judgment lien, the partnership signed a note for only the $150,000 which was disbursed to Justice, Inc. allegedly for the benefit of the partnership. Propps testified he diverted funds away from the partnership to his other projects.

be permitted to disavow the agreement as to priority, yet affirm it as to the validity of its mortgage. *See In re Solomon,* 40 F. Supp. 62, 63 (D. Pa. 1941). Additionally, it seems to us anomalous for ACDG to assert Peoples was a partner in the partnership, yet claim the confession of judgment and mortgage are valid. Under partnership law, one or more but less than all the partners have no authority to confess a judgment unless authorized by the other partners. S.C. Code Ann. § 33-41-310(3)(d) (Rev. 1990).

## CONCLUSION

We hold the preponderance of the evidence establishes that after August 9, 1985, Peoples was not involved in a joint venture with the partnership to develop the project. It did not control either the finances or management of the partnership after that date. The actions of Peoples were either in keeping with usual lender practices or were done with the consent of the partnership or the court and with the intent of protecting its collateral and ensuring the viability of the project. We, accordingly, affirm the order of the master.

Affirmed.

BELL, J., concurs.

GARDNER, J., dissents in separate opinion.

GARDNER, Justice (dissenting):

I respectfully dissent.

This case was originally assigned to the writer to author. I submit as part of my dissent the original opinion, with slight modifications, which I authored and proposed as the majority opinion.

## ISSUES

The dispositive issues of merit are whether (1) the trial judge erred in holding that the so-called consideration of $403,000 for the transfer of the stock of Peoples Joint Venture Group, Inc. was based upon the market value of the stock and that by the transfer, Peoples Federal Savings & Loan Association (the S&L) divested itself of any interest in the profits or control of the real estate development project (the venture),

(2) the trial judge erred in holding that "the sale of the stock was an arm's-length" transaction, (3) the trial judge erred in holding that after August 9, 1985, the S&L was not a joint venturer in the business of the venture, (4) the trial judge erred in failing to hold that because the S&L was engaged in a joint venture with Propps, the S&L was liable to American Community Development Group, Inc. (ACDG) for the debt owed it by Myrtle Beach Golf and Yacht Club, Inc. (MBG&YC), a general partnership (the Partnership) and, therefore, ACDG's lien was superior to that of the Partnership, (5) the trial judge erred in holding that ACDG was judicially and collaterally estopped to assert that the lien of its mortgage was superior to the lien of the S&L's mortgage, and (6) the trial judge erred in holding that ACDG, by consenting to the order of settlement in its case against the Partnership, waived its right to assert lender liability on the basis of joint venture.

## FACTS

In order to avoid duplication or restatement of relevant facts, I review the salient background facts and will incorporate more specific facts within my discussion of the issues.

A major consideration of this case is that the alleged mortgage upon which the S&L bases its case is more than a mortgage. This alleged mortgage, and the other alleged mortgages given by the Partnership to the S&L, are in part mortgages, but contained additional agreements. The subject mortgage provides, *inter alia*, that the word "default" encompasses many situations, including the conveyance of any part of the subject property without the prior approval of the S&L. Thus, the S&L retained control over the terms and conditions, including the purchaser, of any sale within the subdivision or Phase II. The agreements also authorized the S&L, upon default, to take possession of the property and to, in effect, operate the venture.

Early in 1984, the officers of the S&L and R.L. Propps, a real estate speculator, originated a plan for a joint venture to purchase certain tracts of land for the purposes set forth in the next paragraph. The S&L, with a paid in capital of $500, formed a wholly owned subsidiary corporation which it aptly named Peoples Joint Venture Group, Inc. This corporation entered into a partnership agreement with MBG&YC, a closed

corporation wholly owned by Justice, Inc., of which Propps was the principal owner.

The partnership agreement provided that MBG&YC would own a ³⁄₄ interest in the venture and the Peoples Joint Venture Group, Inc. would own a ¹⁄₄ interest. Each partner invested $100 in the Partnership. The parties agreed that the purposes of the Partnership were (1) to acquire a tract of land containing 71.2 usable acres (Tract I) and a tract of land containing 156.5 usable acres (Tract II), both located in Horry County, South Carolina; (2) to develop not less than 295 single-family lots and 48 multifamily lots on Tract I; (3) to develop a nine-hole golf course, clubhouse, swim and tennis club, and lakes on Tract II; and (4) to acquire and develop those certain tracts of land designated as Tract III through Tract X in accordance with a development plan attached to the Partnership Agreement.

The parties also agreed that Tract I would be acquired for a purchase price of $498,400 and Tract II would be acquired for $1,095,500. Importantly, the contract provided that the S&L would provide all funds for the purchase of the two tracts of land and that no additional capital contributions would be required.

Events moved hurriedly. On February 29, 1984, the S&L made a loan to the Partnership in the amount of $1,500,000. On the same day, the S & L made a second loan to the Partnership in the amount of $3,000,000. On August 27, 1984, the S&L made a loan to the Partnership in the amount of $350,000. On September 20, 1984, the S&L made another loan to the Partnership in the amount of $1,800,000. These funds were advanced for the purpose of acquiring the property to be developed and for construction and development costs.

Construction began, roads were built, electrical facilities, and water and sewage disposal facilities were constructed. According to Magrath's testimony things were going well. On August 1, 1985, however, the S&L wrote a letter to the effect that it intended to divest itself of its stock in the Peoples Joint Venture Group, Inc. The record reflects that early in December 1985, construction projects were slowly diminished and came to a stop before April 17, 1986. Construction was restarted on June 30, 1986. During this period, the record shows that the Partnership was involved in various lawsuits,

including several to establish attachments and liens against the Partnership.

The record reflects that the Partnership was sold in June 1986, to Beach Holding Corporation, whose principals remain undisclosed, and that $1,800,000 was infused into the then-failing business of the Partnership. The record is cloudy as to how Propps retained his interest in the Partnership. Evidently Propps had some agreement by which he still remained president of the corporations which owned the Partnership. In April 1987, there is of record a Settlement Agreement in the suit of ACDG v. the Partnership, by and through its general partners, Myrtle Beach Golf & Yacht Club, Inc., and MBG&YCII, Inc. (f/k/a Peoples Joint Venture Group, Inc.), et al. The settlement papers and the Partnership mortgage incident thereto were signed by Propps as the President of the corporations. The record also reflects that Propps was involved in the Partnership business until January 1988.

ACDG put the Partnership and MBG&YCII in bankruptcy on June 3, 1988. Around August 1, 1988, obviously on the petition of the Partnership, the U.S. District Court issued an order permitting the S&L to operate the golf course. It operated the golf course until February 13, 1989, when Ted Miller, an employee of the S&L, was appointed receiver of the golf course portion of the amenities tract of the venture. The receivership was part of the foreclosure proceeding that the S&L instituted on September 12, 1988.

While there is evidence of record by which this Court might well hold that the preponderance of evidence of record establishes that Peoples Joint Venture Group, Inc. was a mere instrument of the S&L and that this Court should pierce the corporate veil of Peoples Joint Venture Group, Inc., I would hold that is not necessary for this decision.

## DISCUSSION

### I.

I would hold that the preponderance of evidence of record establishes that the trial judged erred in holding that the consideration for the transfer by the S&L of its Peoples Joint Venture Group, Inc. stock was based upon the market value of the stock.

On August 1, 1985, George Magrath, Jr. wrote a letter to Justice, Inc. containing a proposition upon which the dispositive facts of this case evolved. I quote in pertinent part:

> In reviewing our file on the Yacht Club, I would like to propose the following structure for the Phase II financing of the project:

| Phase II Amenities Loan (Non-Revolving) | |
|---|---:|
| Existing Amenities Loan | $3,000,000 |
| 18 Hole Golf Course | 1,205,079 |
| Maintenance Complex | 148,000 |
| Swim Club | 183,751 |
| Lakes | 28,961 |
| Clubhouse | 200,455 |
| Interest Reserve | 340,000 |
| Commitment Fee | 21,000 |
| Total Budget | $5,127,246 |

\*   \*   \*   \*   \*   \*

> Peoples would also require that $4,000 from each single family Phase II dwelling closed and $3,000 for each Phase II multi-family dwelling unit closed be applied as a release figure. Peoples would at least initially, require that the net proceeds from each Phase II closing be applied to the amenities loan.

\*   \*   \*   \*   \*   \*

> Finally, Peoples would immediately convey its interest in the Partnership to Justice and/or Loyola for $403,000 to be paid as $500 per closing for each of the 806 closings in Phase II.

I note that the S&L's sales price represented its planned share of the profit on the remaining unsold units and unrealized equity in Phase II of the project. The S&L, thus, assured itself of its anticipated profits when the venture was completed.

There is no answer of record to the proposed loan and sale contained in the August 1 letter, but a commitment letter was issued on August 7, 1985. The transfer of stock of the Peoples Joint Venture Group, Inc. to Propps was consummated on August 9, 1985, on the terms and conditions set forth in the letter

of August 1, 1985. No cash consideration passed for the transfer of stock of the Peoples Joint Venture Group, Inc. to Propps. The S&L did not, on August 9, 1985, or thereafter, make an entry of an account receivable on their books nor is there any evidence of its having received any consideration for the transfer. To the contrary, the preponderance of evidence of record clearly establishes that no consideration ever passed. I address part of the evidence of record.

First, there is the last paragraph, quoted above, of Magrath's letter of August 1, 1985.

Second, the minutes of a meeting of the Board of Directors of Peoples Joint Venture Group, Inc., held on August 8, 1985, reflect that the following motion was made and passed:

> A Motion was made by Mr. Magrath, Jr. to authorize the sale of all the stock of Peoples Joint Venture Group, Inc. to Justice, Inc., Freedom Realty, and/or Rodney L. Propps in consideration of $403,000.00 to be paid as $500 per unit closed in Phase II of Myrtle Beach Golf and Yacht Club. The motion was seconded by Mr. Dargan and passed with a unanimous vote.

Third, Propps testified, "they took our profit projections and took their share of it." Magrath testified about the $403,000 stating, "Mr. Floyd, it was our analysis of what the unrealized equity in that property was."

Lastly, there is of record an interoffice memorandum from Buddy Magrath of the S&L dated August 19, 1987, which provides:

> You mentioned the $403,000 loan. That loan represented the sale of our interest in the project some two years ago. We never took the $403,000 as a gain on the sale and, as such, have effectively completely reserved for it. Likewise, we have not accrued into our income any interest income on that loan.

Of importance, I note that the promissory note by which Propps promised to pay the $403,000 loan was secured by an alleged mortgage and Assignment of Rents and Profits not from Propps or his corporations, but from the Partnership—the venture.

For the above reasons, I would hold that the preponderance

of evidence establishes that the consideration of $403,000 was actually based upon anticipated sales of all of the remaining dwelling units planned to be built on Phase II. The S&L required payments of $500 from each of these units as they were sold. I, accordingly, would hold that the transfer was not based upon the market value of the stock but upon speculative anticipation of unit sales from Phase II. It was, therefore, error for the trial judge to hold that the sales was based upon the then present-day market value of the stock.

## II.

In addition to holding that the transfer of stock was based upon the market value of the stock, the trial judge held that the alleged sale was "an arm's-length transaction." Propps testified *that Magrath knew he had no money at the time* and, in effect, made him accept the offer set forth in the letter of August 1, 1985. Propps explicitly testified that it was not an arm's-length transaction. A casual reading of Propps's testimony of record leads to the conclusion that Propps, when he testified, was mentally confused and uncertain about himself. His answers were contradictory. As between Magrath and Propps, Magrath was obviously the dominant personality. I, therefore, would hold that the preponderance of evidence establishes that the trial judge erred in holding that the alleged sale of the Peoples Joint Venture Group, Inc. was an arm's-length transaction.

## III.

I would hold that the S&L engaged in a joint venture with the Partnership until mid 1988 when it took over the entire venture by permission of the bankruptcy court and under authority of the agreements contained in the alleged mortgage. This becomes evident upon an analysis of: (1) the terms of the various alleged mortgages together with the agreement therein; (2) Assignments of Rents and Profits; (3) the conduct of the parties; and (4) the events which took place subsequent to the sale of the Peoples Joint Venture Group, Inc. on August 9, 1985. This analysis, of course, must be made in the light of the law relating to joint ventures.

I find no South Carolina case setting forth a clear definition of joint adventurers. From the case of *Spradley v. Houser*, 247

S.C. 208, 146 S.E. (2d) 621 (1966), I conclude that the law in South Carolina is that a joint venture exists where there is a combination of two or more persons jointly seeking a profit in some specific venture. Further, in order to constitute a joint enterprise there must be a common purpose and community of interest in the object of the enterprise, and equal right to direct and control the *conduct* of each with respect thereto. Our Supreme Court has held that where it is asserted that a mortgage is in fact evidence of a joint venture there must be an agreement between the parties for participation in the profits of the project beyond the time when the debt has been discharged. *Virginia Hotel v. Dusenberry*, 218 S.C. 524, 63 S.E. (2d) 483 (1951).

On October 9, 1985, an alleged loan of $5,100,000 was made to the Partnership by the S&L. The alleged loan was secured by an alleged mortgage which is the subject matter of the S&L's cause of action in this case.

I have noted that the security instruments taken by the S&L in these transactions, including the $5,100,000 loan which is the subject of this foreclosure action, were more than mortgages. In South Carolina a mortgage is simply a preassigned lien to secure a specific debt. S.C. Code Ann. § 29-3-10 (1976), originally codified in 1791, provides that a mortgage does not give to the mortgagee a right of entry or possession.[1] However, the security instruments taken by the S&L in this case contained the following clause:

## ARTICLE V

### *Additional Rights and Remedies of Lender*

■ Upon the occurrence of a default, Lender, immediately, without notice and without liability therefor to Borrower, except for gross negligence, may do or cause to be

---

[1] S.C. Code Ann. § 29-3-10 (1976) provides:

**§ 29-3-10. Rights and title of mortgagor and mortgagee.**
*No mortgagee shall be entitled to maintain any possessory action for the real estate mortgaged, even after the time allotted for the payment of the money secured by mortgage is elapsed,* but the mortgagor shall be deemed the owner of the land and the mortgagee as owner of the money lent or due and the mortgagee shall be entitled to recover satisfaction for such money out of the land by foreclosure and sale according to law. . . . [Emphasis mine.]

done any or all of the following: (a) *take physical possession of the property;* (b) exercise its right to collect the rents and profits derived from the Property; (c) enter into contracts for the completion, repair, or maintenance of the improvements thereon; (d) expend Loan funds and any rents, income and profits derived from the Property for payment of any taxes, assessments, insurance premiums, utility charges or charges for the maintenance or preservation of the improvements on the Property or the lien of this Mortgage; (e) enter into leases demising the Property or any part thereof; (f) take such steps to protect and enforce the specific performance of any promise, condition, or agreement in the Note, this Mortgage, *or the Loan Agreement,* or to aid the execution of any power herein granted; (g) generally, supervise, manage, and contract with reference to the Property as if the Lender were the equitable owner hereof; . . . [Emphasis added.]

Although the majority opinion holds that commercial mortgages commonly have provisions providing that in case of default the mortgagee may take physical possession of the property, I find no authority supporting this proposition. To the contrary, I would hold that such a provision is prohibited by S.C. Code Ann. § 29-3-10 (1976) as footnoted and emphasized.

In addition to the above contract to deliver possession and control of the subject property, the S&L required an Assignment of Rents and Profits of the Partnership to the S&L. "Generally, a mortgagee is not entitled to the rents and profits from the mortgaged property as a legal incident to, or as a legal right growing out of his mortgage." This rule, however, may be modified by agreement of the parties to the mortgage. *Sellars v. First Colonial Corp.,* 276 S.C. 548, 550, 280 S.E. (2d) 805, 806 (1981).

There is of record a disbursement sheet prepared by the S&L entitled, "Myrtle Beach Golf & Yacht Club Loan Analysis." The disbursement sheet is persuasive evidence which establishes that the S&L was engaged in a joint venture with the Partnership which eventually turned into a sole venture. The disbursement sheet reflects that the funds of the loan were not fully disbursed until November 11, 1986, and further, the disbursement report constitutes a statement of an

ongoing business which culminated on February 5, 1988. It also reflects that the S&L disbursed large sums of money to itself.

For instance, the disbursement statement reflects that the S&L disbursed to itself more than $800,000 and credited these disbursements to other loans owed to the S&L. Ostensibly the S&L made these transfer payments in order to bring current these other loans. The S&L also paid off the $3,000,000 loan indicated in Magrath's letter of August 1, 1985. Interestingly, the payments of interest and principal on this loan were delinquent at the time. The past-due interest was $95,000. The disbursement statement also establishes that the S&L paid itself over $700,000 in rents and profits from the Partnership. Additionally, the disbursement report reflects that the S&L paid itself a consideration for various sales of property belonging to the venture. The S&L paid $150,000 on a debt of Propps for his corporations. A casual study of the "loan analysis" establishes that the S&L was in complete control of the Partnership's finances from October 9, 1985 forward and that it continued to invest large sums of money in a losing proposition. After the $5,100,000 alleged loan, the S&L injected, by way of an alleged loan, another $600,000 in the venture.

All of the above confirms two things. First, it consitutes clear preponderance of evidence that regardless of how the S&L characterized the $5,100,000 account it established on the S&L's books, these funds were an investment by the S&L rather than a mortgage loan.

Second, the disbursement statement confirms what otherwise is apparent from the record. *From the start, in letters to state officials and federal officials seeking public largess in terms of road construction and pavement and FHA guarantees of loans, both George Magrath, Jr. and Propps wrote letters in which they stated in plain, unequivocal and unambiguous words that the S&L and Propps, through his corporations, were engaged in a joint venture. The words "joint venture" were used in these letters.* Magrath testified they were partners until August 9, 1985, when the stock of the Peoples Joint Venture Group, Inc. was transferred to Propps. The record clearly establishes that the transfer was nothing more than a ploy or ruse and that George Magrath, Jr., acting for the S&L, structured the investment of monies and exercised

authority over every aspect of the joint venture—both financial and managerial. There is other evidence of record which establishes this by clear preponderance of evidence.

The S&L's managerial control is illustrated by its continuous financial management of the venture's business obligations. In 1986, the S&L issued checks directly to Homecraft from which the venture purchased prefabricated houses. It issued other checks directly to Sears & Roebuck and other subcontractors and suppliers. Of course, the normal procedure would have been to make the checks payable jointly to the Partnership and the creditors of the Partnership. The S&L also had direct correspondence with the MBG&YC home owners association regarding its concerns about the project in the Spring of 1986.

Moreover, throughout 1987 the S&L guaranteed payments to subcontractors employed by the Partnership. In fact, the S&L made direct payments to subcontractors of approximately $1,000,000 for debts owed by the Partnership. The S&L also made large advances to Justice, Inc., a parent of MBG&YC.

Beginning in mid 1987, the S&L actively participated in and was directly involved in negotiations and efforts to sell the venture to prospective purchasers.

In August 1988, the S&L obtained permission of the bankruptcy court to operate the golf course. There are many letters of record which reflect the truth of the old adage that "Dreams die hard." On October 4, 1988, George Magrath, Jr., wrote Kim Scheurenbrand of the Federal Home Loan Bank of Atlanta a letter. I quote in pertinent part.

> I have attached a plat of the originally envisioned project. The highlighted area essentially represents raw land. The landowners along with a developer have asked that Peoples consider a proposal. The landowner would gratuitously convey adequate land to Peoples in fee simple to build the remaining nine holes of golf as originally envisioned in the master plan. Peoples would fund the hard construction costs relating to those nine holes and would essentially end up with fee simple ownership of a 27 hole golf course. The land involved would be approximately 80 acres with a value of approximately $15,000 per acre. Ac-

cordingly, land with a value of approximately $1,200,000 would come into the transaction. We would have to fund another $1,000,000 to $1,200,000 in construction costs to complete the remaining nine holes.

The above communication was after the S&L had written down the value of its loan more than $1,000,000 and had additionally set up a $1,000,000 reserve for this loan.

As late as November 1988, after institution of this action, the S&L solicited and received bids to perform road work, patching and road extensions on the project.

In December 1988, the S&L's officers and agents incorporated Heron Point Golf Club, Inc. to control and manage the golf course located on the venture. Also in November 1988, the S&L arranged for an ABC license for the golf club and management of the club. This was done through a subsidiary, Heron Point Golf Club, Inc.

As late as January 1989, the S&L maintained all of the golf course personnel on its payroll and on September 8, 1988, the S&L hired a head golf professional for the venture golf course. The S&L bought golf carts and golf course equipment for the venture.

The record establishes that the S&L took charge of the project, receiving income, entering into contracts for services, employing personnel, and actively participating in the maintenance and operations until a receiver was appointed in February 1989.

Lastly, the $403,000 mortgage was clearly based upon the S&L's receiving every penny of profit anticipated by the final conclusion of the venture, i.e., the sale of all the projects envisioned by the venture. This clearly establishes that the S&L intended to be paid not only the entire amount of the loan, but also to be paid every penny of profit it anticipated from the completion of the venture.

I would hold that suffused over the entire record of this case is evidence that the S&L and the Partnership had a joint venture with a common purpose which was jointly controlled by Magrath and Propps until Propps left the insolvent business under the exclusive control and management of Magrath, Jr., acting for the S&L. I would hold that from August 9, 1985, the S&L and Propps, through his wholly owned corporations,

had a common purpose and community of interest in the object of the development and disposition of the subject property, and were, accordingly, joint venturers. *Spradley v. Houser,* 247 S.C. 208, 146 S.E. (2d) 621 (1966). I would reverse the contra ruling of the appealed order.

## IV.

I would hold that the trial judge erred in failing to declare the lien of ACDG mortgage superior to that of the S&L's. A mortgage foreclosure action in South Carolina is equitable and the Court may entertain all questions in issue which are necessary to determine that justice may be done and complete relief be granted as between all the parties before it. *Bramlett v. Young,* 229 S.C. 519, 93 S.E. (2d) 873 (1956). The Court has the power not only to adjudicate on all issues between the holder of the mortgage sought to be foreclosed and the obligor on the mortgage debt but also *"to determine priority, validity, and [the] extent of the claims of all other parties to the action, and, where the proper foundations have been laid in the pleadings, it is error for the Court not to determine the rights of the various claimants."* 59 C.J.S. *Mortgages* § 678 (1949). In this case, the S&L's complaint alleged that its mortgage was superior to that of ACDG, and therefore, the issue was put in the pleadings.

Since I would hold that the S&L was engaged in a joint venture with the Partnership after August 9, 1985, I would hold tht the S&L is liable to ACDG for the indebtedness of the Partnership. I base this holding upon the law that joint ventures are governed by partnership law. *See Few v. Few,* 239 S.C. 321, 122 S.E. (2d) 829 (1961). S.C. Code Ann. § 33-41-370 (1976) provides that all partners are jointly and severally liable for everything chargeable to the partnership. Since the S&L is a joint venturer with the Partnership, it is liable under partnership law to the ACDG on its note and mortgage. Interestingly, as a corollary holding, the S&L's mortgage is satisfied because under the law of partnership, the S&L as a joint venturer and/or partner of the Partnership is liable to itself with respect to the mortgage it seeks to foreclose in this action. When a mortgagee purchases mortgaged property, the mortgage interest is merged within the field of the estate and the mortgage debt is extinguished. *See Agnew v. Charlotte,*

*Columbia and Augusta R.R.*, 24 S.C. 18 (1885). Similarly, when a debtor and a creditor become the same person, the debt, together with the mortgage by which it is secured, is extinguished. For these reasons, I would hold that the trial judge erred in finding that the S&L is not liable to ACDG under the joint venture theory of lender liability. The law I apply here is a clear example of lender liability when the lender is engaged with the borrower in a joint venture for which the money was borrowed.

## V.

I would hold that the trial judge erred in holding that ACDG was either judicially or collaterally estopped to assert its debt against the S&L. In 1987 ACDG, the appellant in this case, instituted an action against the Partnership and obtained a court order enjoining the Partnership from further sales, etc. The parties negotiated a settlement. An inspection of the settlement agreement reveals that the named defendants:

> enter into this Stipulation freely, knowingly, and upon the advice of counsel and requests this Court to enter this Stipulation as a Settlement Agreement in order to continue operating Myrtle Beach Golf & Yacht Club without the threat of imminent foreclosure by the Plaintiff ACDG by and through these proceedings *while this Stipulation and Settlement Agreement remains in effect, subject to the Defendant's complete and timely satisfaction of this Agreement in every respect.* [Emphasis added.]

Pursuant to that agreement, ACDG agreed to accept a down payment on the indebtedness and a mortgage, junior and subordinate, to the S&L $5,100,000 mortgage which is the subject of this action. As noted, this agreement was based upon a stipulation that it was subject to the Partnership's compliance with the terms of the agreement, the note and the mortgage. It is important at this time to state that the record shows that the Partnership and Propps did not comply with the terms of the agreement. Compliance with the terms of the agreement, the note and the mortgage constituted a condition subsequent in the settlement agreement. The Partnership and Propps breached this condition subsequent by their default in

the payment of the installments provided by the note and the mortgage. Because the settlement agreement was subject to the Partnership's complete and timely satisfaction, we hold that the trial judge erred in holding that ACDG was judicially estopped to assert the counterclaims it asserted. "The estoppel of a consent judgment cannot be extended beyond the scope of the stipulation or the agreement." 50 C.J.S. *Judgments* § 705 (1947).

Collateral estoppel, also known as issue preclusion, is a legal theory under which it is held that once an issue is litigated, the parties are collaterally estopped to relitigate the issue which was litigated. The issue of the settlement agreement was not an issue joined by the pleadings nor was it one which was litigated. The settlement agreement was a compromise and not a litigated issue. I, accordingly, would hold that the trial judge erred in holding that ACDG was collaterally estopped to assert the seniority of its lien in this case.

## VI.

Waiver is the intentional relinquishment of a known right. *See Stovall Bldg. Supplies, Inc. v. Mottet*, 305 S.C. 28, 406 S.E. (2d) 176 (Ct. App. 1990). As noted, the settlement agreement contained a provision to the effect that the stipulation and settlement were subject to the Partnership's complete and timely satisfaction of the agreement in every respect. Accordingly, I would hold that the trial judge erred in holding that ACDG had waived its rights under the settlement agreement.

## CONCLUSION

I would hold, as noted, that the preponderance of evidence in this case establishes that the S&L, after October 9, 1985, not only was involved in a joint venture with the Partnership from which it expected to profit $403,000 upon the completion of the sale of all dwelling units envisioned to be sold, but it also enjoyed the exclusive control of the finances of the operation and at least control of the operation itself after August 9, 1985. The scheme that the S&L and Propps hatched in 1984 resulted in the loss of millions upon millions of dollars not only to the S&L, but to other lending institutions and persons. I would hold that the S&L was engaged in a joint venture; a venture which it ultimately took over pursuant to the agree-

ment contained in the purported mortgage-joint venture agreement and the Assignment of Rents and Profits. For these reasons, I would hold that the S&L is liable to ACDG for the indebtedness owed to ACDG and secured by its mortgage. I would further hold that there has been no waiver, collateral estoppel or judicial estoppel, and that the trial judge erred in all of the appealed order which is inconsistent with this dissent.

I, accordingly, would reverse and remand.